

**SIGNED this 05 day of April, 2006.**

_____
                         **FRANK R. MONROE**
                   **UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | CASE NO. 05-10068-FM |
| ADMIRAL CONSTRUCTION, INC. ) | |
| ) | CHAPTER 11 |
| DEBTOR ) | |

<u>MEMORANDUM OPINION</u>

The Court held a hearing on January 23, 2006 on LWR Family Partnership L.P.'s ("LWR") Motion to Determine Lien Priority and For Disbursement of Funds.[1] The sole issue presented for determination is the relative priority of the lien claims asserted by LWR and Jimmy Evans Co. ("Evans Co.") to certain funds held in escrow pursuant to a sale. At the conclusion of the hearing, the Court took the matter under advisement. This Court has jurisdiction of this proceeding pursuant to 28 U.S.C. §1334(a) and (b), 28 U.S.C.§157 (a) and (b)(1), 28 U.S.C. §151 and the Standing Order

---

[1] Bankruptcy Rule 7001 requires that proceedings to determine priority of liens be adversary proceedings. However, this controversy exists only between two claimants as to their respective lien priority and both claimants agreed to try this matter as a contested hearing instead of in an adversary proceeding.

of Reference of all bankruptcy related matters by the United States District Court, Western District of Texas. This Memorandum Opinion is being issued as written Findings of Fact and Conclusions of Law as required by Bankruptcy Rule 7052 which is made applicable to contested matters under Bankruptcy Rule 9014.

## Findings of Fact

Admiral Construction, Inc. ("Debtor") was the owner of certain property generally described as Lots 18001, 18002, 18003, 18004, 18012, 18013 and 18014, Bar-K Ranches, Section Eighteen, according to the Recorded Map or Plat in Volume 82, Page 151, of the Plat Records of Travis County, Texas (the "Property"). The Property was recently sold for $1.25 million, out of which certain claimants have already been paid. The remaining sale proceeds were placed in escrow pending a determination as to the relative priority of the liens of LWR and Evans Co.

Beginning in November, 2003 Evans Co. began submitting written proposals and negotiating with the Debtor to do certain construction work at the Property which at the time was raw land. The work is generally described in the proposals as "Site Work" and "Street Work". (See proposals marked as Joint Exhibit 1). Some of the initial proposals covered all of the work Evans Co. proposed to do on the project, but the later proposals broke down the work and the associated costs into two separate proposals for: a) construction of the streets called "Street Work" and b) construction of the other improvements on the site itself called "Site Work".

On January 16, 2004 the Debtor faxed to Evans Co. a letter authorizing them to "proceed with the street work only at Lago Vista, as per your Proposal dated January 15, 2004 in the amount of $220,836.07." (Joint Exhibit 2). The January 16, 2004 letter referenced "Revised Proposal No. 6 for Lago Vista Retail-Street Work Only."

Evans Co. has produced an equipment record to reflect that at least one front loader was used at the property on January 7th and 8th, 2004 as well as employee time records for the week of January 11, 2004 and a fencing invoice dated January 12, 2004 indicating several employees spent time the week of January 11, 2004 putting up fencing materials around the periphery of the Property. (Joint Exhibit 8 and 10 ). The employee record reflects four employees on the Property January 11, 12 and 13, 2004 and one employee for the entire week January 11-15th. There were no other employee records or equipment records submitted to show employees working on January 7 and 8th or equipment being used January 11-17th.

Kevin Griffin, Vice President with Evans Co., the employee in charge of this particular project and a veteran construction worker testified regarding the work allegedly performed in early and mid January. Paul Pennybacker, a construction consultant hired by Evans, Co. for the project, also testified on Evans Co.'s behalf. Mr. Pennybacker had taken certain date-marked Photographs that depicted certain types of work done on the project as well. ( Respondent's Exhibits 1-9 dated January 7, 2004 and 10-23 dated January 20, 2004). Mr. Pennybacker had consulted with Evans Co. on many projects and testified that he took photographs on most if not all the projects he worked on.

Mr. Griffin and Mr. Pennybacker acknowledged that a pre-construction meeting was held on January 6, 2004 where Evans Co. representatives, Mr. Pennybacker, city officials and other subcontractors met to discuss road closures, erosion controls and other city concerns with the project. Mr. Griffin indicated the Debtor's principal, David Young, told him to start the project immediately after this meeting; although contrary to this is Mr. Young's letter dated January 16, 2004 authorizing the "Street Work" only to begin.

Mr. Griffin testified that all the trees and shrubs had been removed at the site in early January and that test holes were dug in certain areas. In addition, Evans Co. erected safety fencing around some of the perimeter of the project. Mr. Griffin explained that the Photographs depicted the clearing and grubbing of the trees, the stripping and the test hole site, a front-end loader placing rock in a ravine for drainage purposes, additional excavation for cut and fill to prepare the street and site for paving and excavation for a filtration pond. He also indicated that fill dirt had already been spread in certain areas. (Respondent's Exhibits 1-23). Mr. Pennybacker basically affirmed Mr. Griffin's testimony indicating that his Photographs 1-9 taken January 7, 2004 depicted tree clearing was completed, grinding of the trees had begun and some excavation had started on the upper portion of the site. He testified that Photographs 2, 5, 7, 8, 11 and 17 specifically show excavation work. Mr. Pennybacker defined clearing /grubbing to be work above ground such as the tree removal and clearing of the site and excavation to mean digging in the ground. It was Mr. Pennybacker's opinion that holes dug for testing were an integral part of the excavation process. This was the only work done by Evans Co. at the Property prior to mid-February, 2004 when the main construction commenced.

During this same timeframe, the Debtor approached LWR through a broker about making a $200,000 loan to the Debtor to cover most of the cost of the land preparation work at the Property. LWR agreed to make the loan. On January 27, 2004 prior to making the loan, Larry Rother, the representative of LWR, visited the Property to insure that no construction work had commenced that might endanger the priority of LWR's lien. Mr. Rother had been involved in several other commercial construction projects and served on the board of directors of a local bank. Mr. Rother testified that he drove the entire Property and was satisfied that construction had not commenced.

He, however, acknowledged that cedar trees and other brush had been cleared from the Property but commented that such clearing did not look recent. He also observed a tractor parked on the corner of the Property and a hole which he says he was later told was for soil testing purposes. He testified that he saw no other evidence of any excavation such as cuts for pad sites or digging of filtration ponds. He had been told by Mr. Young that Evans Co. would be starting work after the loan was made so he assumed the tractor was there in readiness to begin work. Mr. Rother did not contact Evans Co. directly. Additionally, the loan broker, Dick Matz, testified that he also inspected the Property and although he did not see cuts for pad sites or any pond excavation, he also observed that the trees had been cleared off the Property. Mr. Young did not testify.

  LWR's loan closed and funded on January 28, 2004 and the deed of trust recorded on January 30, 2004. Evans Co. then initiated the main construction at the Property in mid-February. In that regard, Evans Co. entered into two standard form contracts with the Debtor executed on April 8, 2004 but stated to be effective February 16, 2004 (Joint Exhibits 3 & 4). There was no explanation why February 16 was chosen as the effective date. The first contract indicated it was for "Street Work Only" and had as an attachment the January 15, 2004 proposal showing street work totaling $220,836.07. The second contract indicated it was for "Site Work Only" and had as an attachment a separate proposal dated January 12, 2004 showing site work totaling $556,207.04. Mr. Griffin indicated that the contracts were separate for purposes of certain assessments made by the city, but that for all other purposes Evans Co. treated the contracts as one because it was one site and that some of the same work had to be done for both contracts. Mr. Pennybacker also testified that it was his understanding that it was one project.

On June 14, 2004 Evans Co. filed two lien affidavits. (Joint Exhibits 5 and 6.) The first affidavit claims a lien on the Property in the amount of $14,010.30. Attached to that affidavit is an invoice reflecting $14,010.30 owed by the Debtor attributable to the "Street Work" contract. The second affidavit claims a lien in the amount of $153,533.14 and referenced an attached invoice reflecting this amount owed attributable to "Site Work" contract.

On July 13, 2004 Evans Co. filed a third lien affidavit, in the amount of $144,682.50 more specifically referenced at Paragraph 8 of the Affidavit as $130,974.30 for "Site Work" for March, $12,201.26 for "Street Work" for April and $1,506.94 for "Site Work" for April. Joint Exhibit 7. The attached invoices supported this breakdown.

LWR's position is that the early site clearing, grubbing, fencing and other work done in early-mid January, 2004 was not "commencement of construction" for purposes of inception under Texas Property Code Section 53.124. In the alternative LWR urges that even if the work performed was "commencement of construction" such work was only being performed under the pre-authorized "Street Work" contract, and therefore only Evans Co.'s liens for money owed under the "Street Work" have priority over LWR's lien. Evans Co.'s position is obviously in opposition.

<u>Issues Presented</u>

1. Does the clearing, grubbing, fencing and other work performed by Evans Co. in early-mid January, 2004 on the Property constitute "commencement of construction" and therefore inception of a lien for purposes of Texas Property Code Section 53.124?

2. If such clearing, grubbing, fencing and other work constitutes "commencement of construction" then is such work being performed only under the pre-authorized "Street Work" contract so that only the liens for money owed under the "Street Work" contract are entitled to

priority?

Conclusions of Law

1. Inception of the Lien

A mechanic's lien "relates back" to the time of the inception of the original lien. Section 53.124(a) of the Texas Property Code provides that "the time of inception of a mechanic's lien is the commencement of construction of improvements or delivery of materials to the land on which the improvements are to be located and on which the materials are to be used." *Tex. Prop. Code §53.124(a)*. Section 53.124(b) further provides that "the construction or materials under Subsection (a) must be visible from inspection of the land on which the improvements are being made." *Tex. Prop. Code §53.124(b)*.

"Improvement" is defined in Section 53.001(2) of the Property Code to include:

(A) abutting sidewalks and streets and utilities in or on those sidewalks and streets;
(B) clearing, grubbing, draining or fencing land;
(C) wells, cisterns, tanks, reservoirs, or artificial lakes or pools made for supplying or storing water;
(D) pumps, siphons, and windmills or other machinery or apparatuses used for raising water for stock, domestic use, or irrigation; or
(E) planting orchard trees, grubbing out orchards and replacing trees, and pruning of orchard trees.

*Tex. Prop. Code §53.001(2).*

"Material" is defined in Section 53.001(4) of the Property Code as follows:

"Material" means all or part of:

(A) the material, machinery, fixtures or tools incorporated into the work, consumed in the direct prosecution of the work, or ordered and delivered for incorporation or consumption;

(B) rent at a reasonable rate and actual running repairs at a reasonable cost for construction equipment used ro reasonably required and delivered for use or

>    reasonably required and delivered for use in the direct prosecution of the work at the site of the construction or repair; or
>
> (C) power, water, fuel and lubricants consumed or ordered and delivered for consumption in the direct prosecution of the work.

*Tex. Prop. Code §53.001(4).*

A careful mortgage lender will inspect the construction site immediately prior to closing his loan to make sure there is no visible evidence of construction or delivery of material. If such is found to be true and if there are no previous recorded contracts or affidavits, the lender may proceed to close and fund the loan secure in the knowledge that it has a first lien on the land and all non-removable improvements. Occasionally, however, the lender finds that some type of activity has commenced on the site prior to mortgage recordation. In order to evaluate the significance of that on-site activity, the lender must be acutely aware of the specific events which constitute "commencement of construction" and "delivery of material." This is possibly where LWR failed.

The leading case regarding the "relation back" doctrine under Texas law and the question of when construction commences is *Diversified Mortgage Investors v. Blaylock,* 576 S.W.2d 794 (Tex. 1978)[2].

The *Blaylock* court declared that "where a building or structure is the principal 'improvement' involved,'" a test is needed which excludes activities merely preparatory to the construction of the building or structure. *Id.* at 803. That conclusion was based on its observation that, by use of the term "actual commencement" in the priority statute, the legislature must have intended to require "the placing of something of permanent value on the land, as opposed to

---

[2]Although *Blaylock* interpreted Tex. Rev. Civ. Stat. Ann. art. 5452 (Vernon), the opinion carries precedential value as Section 53.124 of the Property Code virtually mirrors the language in art. 5452 with respect to what activities constitute commencement.

preliminary or preparatory activities or structures'" and that preparatory activities are excluded by a majority of other jurisdictions. *Id.* Noting that "under most circumstances" the construction of a building or structure entails excavation for or the laying of a foundation, the court held that if the improvement is a building or structure, the excavation for or the laying of the foundation constitutes the commencement of construction. *Id.*

The *Blaylock* court also found that performance of a specific activity defined in article 5452 as an "improvement" also constitutes an event of inception regardless of whether an actual building or structure is also built. The *Blaylock* court held that merely beginning the performance of any such activity will constitute the commencement of the construction of an "improvement" within the meaning of the priority statute. *Id.* at 802.

Consequently, per *Blaylock*, the inception of the mechanic's and materialmen's lien occurs when the activity (1) is conducted on the land itself; (2) is visible upon the land; and (3) constitutes either (a) an activity which is defined as an improvement under the Texas statute or (b) the excavation for or the laying of the foundation of a building or a structure. *Id.*

The *Blaylock* case involved two specific sites on which hotels would be built. The Fort Worth project evidently needed no site clearing. The following activities were performed on the lot: subsurface investigation, topographical survey work, the spreading of fill dirt, staking, erection of batter boards, excavation for a retaining wall and erection of a sign.[3] *Id.* at 797. These activities were viewed merely as preliminary or preparatory and did not constitute actual commencement of

---

[3] Batter boards are L shaped structures which stand two feet off the ground and extend five feet in each direction. Such boards defined the corners for the building.

9

construction as actual foundation work had not begun.[4] Blaylock appears to say that even certain activities that can be defined as part of the excavation process are still considered preliminary or preparatory unless they are construction of the actual foundation.

The Irving project was slightly different. A subcontractor performed excavation and clearing work in the nature of grubbing activity which included: general site clearance, the digging up and removing of several large trees and the digging up and removal of a swimming pool which was previously located on the site. These activities were deemed as "improvements" that were visible upon inspection of the land and therefore constituted inception of the lien. Note that batter boards had also been delivered and erected and fill dirt delivered and spread, but the Court does not mention these activities as constituting "improvements" or as the "excavation for or the laying of the foundation of a building or structure." *Id.* at 798. It was only the "clearing" activity that constituted an "improvement" under the mechanic's lien statute.[5]

The Texas Supreme Court does not strictly adhere to the view that, if the principal improvement is a building, all liens have their inception from the actual commencement of foundation work, lest contractors who perform an earlier "improvement" activity have their priorities postponed until the commencement of the foundation. Obviously, the *Blaylock* court was concerned about protecting earthwork contractors as it determined preparatory "improvement" activities marked

---

[4] The court viewed the erection of the batter boards as preparatory to building a foundation. Fill operations that entailed moving dirt upon the land to prepare the ground for foundation and the grading of the lot that involved six trucks and front end loaders working on the property were also actions described as preparatory to the actual foundation work. Excavation for a retaining wall and a sign indicating a "Dollar Inns" motel was in progress were also considered preparatory.

[5] Two other activities were also sufficient to constitute inception of the mechanic's lien, but these were delivery of materials as defined by statute and the actual excavation for perimeter beams for the foundation and the actual laying of concrete foundation.

the commencement of construction of the building. The court included only "improvements" defined in the statute and excluded other obvious improvements not set out in the statute even though they were necessary prior to actual excavation and construction of a foundation. The question here is whether the activities of Evans. Co. in early or mid January constitute either activities defined as "improvements" under the lien statute or activities which constitute "excavation and/or laying for a foundation."

Evans Co. argues that it commenced construction on the Property on or about January 7, 2004, that such construction was visible upon the land and was either an improvement as that term is defined in the Property Code and/or the laying of the foundation of a building or structure to be constructed on the Property or both. Mr. Griffin testified that such clearing and grubbing had been performed by Evans Co. on January 7 and 8th. Mr. Rother also testified that when he visited the Property, he saw that the trees had been cleared, piled up in a mound and the site cleaned. In addition, the equipment records of Evans Co. indicate certain equipment on the site on those days. And, Photographs 2 and 3 taken on January 7, 2004 by Paul Pennybacker confirm that this clearing and grubbing in effect happened. The Photographs reveal a mound of trees that were obviously cleared from the site, tree grinding equipment and the cleared site itself. They also show a bulldozer moving rock.

LWR does not assert that "clearing and grubbing" cannot equate to "commencement of construction." Instead, LWR urges that in this instance such was not visible upon inspection of the land. LWR claims that the tree clearing was merely to make the site more attractive for investors and that Mr. Young, the Debtor's principal, told Mr. Rother such. LWR argues that since Evans Co.'s clearing/grubbing was done one and ½ months before the actual construction began, the

inspection of the Property in late January did not reveal that construction work of any sort had begun--merely that the Property had been cleaned up and cleared in apparent readiness for construction to begin. LWR also argues that because Evans Co. performed the clearing and grubbing at no charge under the contract that a lien cannot incept.

There is nothing in the lien statutes that indicate any required time length between inception and fulfillment of the construction contract or that performing such work at no cost under the contract prohibits such inception. The Court can find no case law or other authority with respect to these issues. What is clear from reading *Blaylock* is that the Texas Supreme Court wanted to protect site clearing contractors in addition to construction contractors when it could. "Clearing" and "grubbing" are obviously improvements defined by the lien statutes and such was obviously visible upon inspection. Mr. Rother and Mr. Matz both testified that the trees had been cleared and the site cleaned and a test hole dug. Mr. Rother also knew that Evans Co. was not the building contractor but merely the earthwork contractor. Perhaps, Mr. Rother should have been more familiar with the requirements for inception under the lien laws for "improvements," or he should have at least contacted Evans Co. to determine its position with respect to any work performed prior to LWR making the loan.

Evans Co. contracted with the Debtor to perform certain construction work that included clearing and grubbing of trees. "Clearing and grubbing" are defined items under both the "Street Work" contract and the "Site Work" contract. Evans. Co. performed such clearing and grubbing on the Property prior to LWR making the loan to the Debtor. Such work was visible upon the land and is encompassed as "improvements" under the lien statutes and can therefore be considered such for lien inception purposes.

In addition, Evans Co. on the week beginning January 11, 2004 performed several other activities at the site. From the records, there were at least five employees at the site during this week and a fencing invoice indicates supplies purchased for such on January 12, 2004. There are no equipment records for these dates. And, although Mr. Rother did not mention any fencing in place when he visited the site on January 27, 2004, the Photographs taken January 20, 2004 show fencing installed around some of the Property's perimeter. The testimony by Mr. Griffin corroborated that this was in fact done around January 12, 2004 as a safety measure and that such fencing was temporary.

LWR asserts that "fencing" cannot be a "material" as defined in Section 53.001(4) of the Property Code as it is material that is not incorporated into the work, consumed in the direct prosecution of the work, or ordered and delivered for incorporation or consumption. LWR is correct. But, "fencing land" is defined as an "improvement" in Section 53.001(2). The Court cannot find any case law or other authority defining the type of "fencing" necessary to be an improvement under this section. Based on a literal reading of the statute, the temporary fencing of the Property by Evans, Co. should also be considered as an "improvement" on the Property and visible for lien inception purposes as it was placed prior to the closing on the loan.

What is more difficult is whether the other activities supposedly performed during that week either constitute "improvements" per the statute or can be viewed as "excavation for and/or laying of foundation of a building or structure."

According to Mr. Griffin, the other activities depicted in the Photographs were digging test holes, moving rocks to a ravine area for drainage purposes, beginning excavation for the site, street and filtration pond and cut and fill activities. Mr. Pennybacker testified that Photographs 2, 5, 7 and

13

8, 11 and 17 in his opinion exhibit excavation activities.

*Blaylock* found that subsurface investigation, the spreading of fill dirt, staking, erection of batter boards, excavation for a retaining wall and erection of a sign were preliminary and/or preparatory activities for construction and not commencement of construction. Actual excavation for the foundation would be necessary in order to find such activities "commencement of construction" on a building. From a review of the Photographs, some excavation work had been done as the loader is obviously moving dirt/caliche in several of the Photographs. However, the Court cannot definitively find from the testimony or the Photographs that excavation for and or laying of foundation of the actual building had begun. Nor can the additional work be defined as an "improvement" for lien inception purposes. None of this work is encompassed in the definition of "improvement" except possibly the excavation of the filtration pond. Mr. Griffin testified that Photograph 12 depicted where the filtration pond work had commenced. Although this is very likely true, the Court cannot find such filtration pond visible from an inspection of the Photograph and therefore must hold it is not visible from an inspection of the Property. None of these activities, although such can be described as excavation activities, are sufficient to constitute inception of a mechanic's lien.

Nevertheless, the grubbing and clearing and the erection of fencing were commenced prior to LWR's lien being recorded, were clearly visible, and are within the scope of the *Blaylock* court's guidelines. Relation back is appropriate.

2. Separate Contracts

But, relation back of what? LWR asserts that each contract i.e. "Street Work" and "Site Work" must be evaluated separately since the Debtor confirmed in writing to Evans Co. that it was

only authorized to commence work on the "Street Work" contract. Therefore, any relation back can only be in connection with the "Street Work" contract.

LWR analogizes this fact situation to one in *H.B. Zachry Co. v. Waller Creek, Ltd.,* 867 F.2d 228 (5th Cir. 1989). In that case, the debtor entered into two separate construction contracts with Zachry Co. with respect to two separate improvements–a hotel and a garage (the hotel was to be built on top of the garage). Zachry Co. commenced construction on the garage by beginning demolition of existing structures and excavation at the site. A number of subsequent deed of trust liens were then filed after the demolition and excavation had begun.

In the bankruptcy court, Zachry Co. asserted a priority lien on both the garage property and the hotel property, the inception date of which it claimed to be the date demolition started at the site. Zachry Co. contended that demolition and excavation were necessary to the work to be done under both contracts. The Bankruptcy Court rejected this argument finding that there were two distinct contracts and that only the lien for work done on the garage dated back to the original demolition/excavation work.

The District Court affirmed and the Fifth Circuit also affirmed concluding that "[i]n sum, despite the common-law principle in Texas that courts should construe the statutory provisions for mechanic's liens broadly, the competing principle announced by the *Lyon* court, that an owner may limit the scope of mechanic's and materialmen's liens by negotiating separate contracts for improvements, applies with convincing force in this case. The contracts indeed were separate and distinct, and the parties consistently treated them as such." *Id*. at 236 citing *Lyon v. Logan,* 68 Tex. 521, 5 S.W. 72 (1887).

In *Zachry Co.* none of the construction work actually done on the project had been charged to the hotel contract so the construction activities under the garage contract could not give rise to a mechanic's lien for the hotel project. In fact, in the specifications prepared for the hotel and garage, Zachry Co. was to perform all the demolition, earthwork, drainage, etc. under the garage contract alone. Moreover, after construction began Zachry Co. applied for payment for these activities only under the garage contract.

Evans Co. claims it had two contracts with the Debtor because of the manner certain city assessments would be made on site work and street work although this reasoning was not explained in depth. Evans Co. further urges that both contracts were for the one site and for all other purposes were treated as one job. Testimony from Mr. Griffin indicated that the clearing, grubbing, fencing and other work were necessary under both contracts not just for the "Street Work" contract" or the "Site Work" contract in particular.

Both contracts do itemize "clearing and grubbing" as well as "excavation" as activities to be performed by Evans Co. pursuant to each respective contract. And, the initial proposals by Evans Co. did treat the street and site work as one construction project. However, Evans Co. ultimately prepared two separate proposals, one for the "Street Work" and one for the "Site Work" for the Debtor. Likewise, Evans Co. entered into two separate construction contracts with the Debtor–one for the "Street Work, the other "Site Work." And, as evidenced by the lien affidavits, Evans. Co. invoiced the Debtor under the separate contracts. So, the projects were not treated as one project.

Mr. Griffin claims that after the pre-construction meeting on January 6, 2004 that David Young authorized Evans Co. to proceed immediately under both contracts. If such be true it is puzzling why it was then necessary for the Debtor to specifically authorize Evans Co. by letter dated

January 16, 2004 to begin work on the "Street Work" contract only. This was the only written authorization to Evans Co. prior to the Debtor closing its loan with LWR. This leads the Court to the following conclusion: the Debtor and Evans Co. intended to, and did, negotiate separate contracts for improvements; they operated under these two contracts and separately invoiced under them; and the fact that the Debtor authorized in writing commencement of work under the "Street Work" contract only is evidence that they were treated separately and that such was the parties' intent. The fact that clearing and grubbing were components of both contracts is irrelevant as Evans Co. conducted the clearing and grubbing only under the "Street Work" contract as that was the only contract it was authorized to begin work under prior to the filing of LWR's lien. Relation back, therefore, can only occur under the "Street Work" contract.

## Conclusion

The clearing, grubbing, and fencing performed by Evans. Co. in early-mid January, 2004 gives rise to a lien with respect to the "Street Work" contract only as that relates back prior to LWR's lien. It cannot relate back to any lien which secures the Evans Co.'s "Site Work" as it was not authorized to initiate such work prior to LWR's lien. According to the evidence, the "Street Work" lien which relates back is in the sum of $26,211.56, the "Site Work" lien which does not relate back is in the sum of "286,014.38. Counsel for LWR is directed to submit an Order in accordance with this ruling approved by counsel for Evans Co..

###